# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>114 FOX RUN COURT, DURHAM, NORTH CAROLINA<br>27705 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 20MJ209

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1425 | PROCUREMENT OF CITIZENSHIP OR NATURALIZATION UNLAWFULLY |
| 18 U.S.C. § 1546 | FRAUD AND MISUSE OF VISAS, PERMITS, AND OTHER DOCUMENTS |
| 18 U.S.C. § 1028(a) | FRAUD IN CONNECTION WITH IDENTIFICATION DOCUMENTS |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ CHRISTOPHER E. BRANT
*Applicant's signature*

CHRISTOPHER E. BRANT, SPECIAL AGENT, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 7/23/2020

_____
*Judge's signature*

City and state: WINSTON-SALEM, N.C.

THE HON. JOI ELIZABETH PEAKE
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE
SEARCH OF 114 FOX RUN COURT,
DURHAM, NORTH CAROLINA
27705

Case No. 20 MJ 209

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Christopher E. Brant, being duly sworn, depose and state as follows:

1.     I am a Special Agent (SA) of the Department of Homeland Security
(DHS), Immigration and Customs Enforcement (ICE), Homeland Security
Investigations (HSI) and have been so employed for over 13 years. I am assigned to
the HSI Raleigh, North Carolina field office (HSI-Raleigh) and my duties include,
among other things, investigating violations of Titles 8, 18, 19, 21, 31, and 42 of the
United States Code. As part of these duties, I have led or participated in hundreds
of investigations involving criminal and/or administrative violations related to
money laundering, intellectual property rights, narcotics trafficking, bulk cash
smuggling, identity theft, immigration benefit fraud, document fraud, visa fraud,
human smuggling, human trafficking, the illegal entry and/or re-entry of aliens, and
immigration status violators. Prior to reporting for assignment at HSI-Raleigh, I
attended training at the Federal Law Enforcement Training Center (FLETC) in
Glynco, Georgia, where I received instruction in federal criminal statutes, search,
seizure and arrest authority, use of force, and many other facets of federal and

1

general law enforcement. Prior to attending FLETC, I worked five (5) years as an accountant and obtained undergraduate and master's degrees in business administration and finance.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. This affidavit is made in support of a search warrant of the residence of an individual identifying himself as John Monday Ujiagbe Idiagbonya (hereinafter referred to as "IDIAGBONYA"), also known as "John Ikhile" (hereinafter referred to as "IKHILE"), located at 114 Fox Run Court, Durham, North Carolina 27705 (hereinafter referred to as the "SUBJECT PREMISES"), located within the Middle District of North Carolina. The SUBJECT PREMISES is more particularly described in Attachment A of this Affidavit.

4. Because this affidavit is being submitted for the limited purpose of securing a warrant to search the SUBJECT PREMISES, I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1425 "Procurement of Citizenship or Naturalization Unlawfully," 1546 "Fraud and Misuse of Visas, Permits, and Other Documents," and 1028(a) "Fraud in Connection with Identification Documents" (hereinafter referred to as the "SPECIFIED FEDERAL OFFENSES") will be located at the SUBJECT PREMISES. More specifically, I seek

2

authorization to locate items described in Attachment B and to seize those items as evidence, fruits, and instrumentalities of the SPECIFIED FEDERAL OFFENSES.

### TARGETING GROUP FOR INADMISSIBLE ALIENS AND OPERATION JANUS

5.      Historically, ICE, Customs and Border Protection (CBP), and their predecessor, the Immigration and Naturalization Service (INS), collected an alien's fingerprints on two (2) paper cards. One (1) card was supposed to be sent to the Federal Bureau of Investigation (FBI) and the other card was to be placed in the alien's file (A-file) with all other immigration-related documents.

6.      In 2007, DHS established its Automated Biometric Identification Systems (IDENT) as the centralized, department-wide digital fingerprint repository. The digital repository, however, was missing digitized fingerprints of those aliens whose fingerprints were previously taken on paper cards.

7.      In 2009, DHS created the Targeting Group for Inadmissible Aliens (TGIS), now referred to as Operation Janus. TGIS/Operation Janus was created to access and mitigate the potential threats to national security posed by vulnerabilities in the immigration system after it was discovered that numerous individuals who had received final deportation orders had subsequently used different biographical identities to obtain immigration benefits (e.g. lawful permanent resident status or naturalized citizenship).

3

8.     In 2012, DHS received funding to digitize old paper fingerprints and to upload those fingerprints into IDENT. This initiative was called the Historical Fingerprint Enrollment (HFE), and through this initiative, ICE began uploading and digitizing old paper fingerprint cards of an estimated 315,000 aliens with final deportation orders, criminal convictions, or fugitive status. As expected, numerous individuals with final deportation orders were identified by DHS as having obtained immigration benefits under different biographical identifiers.

## IMMIGRATION HISTORY OF IDIAGBONYA

9.     In the course of investigating this matter, I have reviewed the official A-File of an individual claiming to be John Idiagbonya, born in Ewohimi, Nigeria on a certain date in 1957. The A-file, numbered A027 225 658, reflects the following information:

  a. On or about November 27, 1984, IDIAGBONYA received an F-1 nonimmigrant student visa from the United States Consulate in Beijing, China.

  b. On or about December 2, 1984, IDIAGBONYA was admitted to the United States at San Francisco, California as an F-1 nonimmigrant with authorization to remain in the United States for the duration of his status.

4

c.      On or about July 19, 1985, IDIAGBONYA married Emma Jean Garrett
        (hereinafter referred to as "Garrett"), a United States citizen, in
        Minneapolis, Minnesota.

a.      On or about September 3, 1985, IDIAGBONYA was the beneficiary of a
        "Petition to Classify Status of Alien Relative for Issuance of Immigrant
        Visa" (INS Form I-130) filed with the INS by Garrett.

b.      On or about September 3, 1985, IDIAGBONYA contemporaneously filed
        an "Application for Status as Permanent Resident" (INS Form I-485)
        with the INS.

d.      On or about September 3, 1985, Garrett was interviewed regarding her
        INS Form I-130. Garrett admitted during the interview that she and
        IDIAGBONYA did not reside together and that they entered into the
        marriage in bad faith and for the sole purpose of obtaining an
        immigration benefit for IDAGBONYA. Garrett withdrew her INS Form
        I-130.

e.      On or about September 4, 1985, IDIAGBONYA's INS Form I-485 was
        denied. IDIAGBONYA was served an "Order to Show Cause, Notice of
        Hearing, and Warrant for Arrest of Alien" (INS Form I-221S) and
        ordered to appear at a hearing before an Immigration Judge.

5

f.    On or about December 5, 1985, IDIAGBONYA was granted a voluntary departure in lieu of deportation by an Immigration Judge in St. Paul, Minnesota.

g.    On or about December 17, 1985, IDIAGBONYA voluntarily departed the United States to Beijing, China via aircraft.[1]

h.    On or about December 21, 1987, IDIAGBONYA received a B1/B2 nonimmigrant visitor visa from the United States Consulate in Toronto, Canada.

i.    On or about January 29, 1988, IDIAGBONYA was admitted to the United States at Buffalo, New York as a B1/B2 nonimmigrant visitor for pleasure with authorization to remain in the United States until July 28, 1988. Records indicate IDIAGBONYA failed to depart the United States after his authorized term of admission.

j.    On or about March 20, 2001, IDIAGBONYA married Juliet Idiagbonya (hereinafter referred to as "J. Idiagbonya") in Worcester, Massachusetts. At the time, J. Idiagbonya was a nonimmigrant skilled worker or professional.

k.    On or about April 18, 2001, J. Idiagbonya became the beneficiary of an "Immigrant Petition for Alien Worker" (Form I-140) filed with the INS.

---

[1] At the time, IDIAGBONYA's father was a Nigerian diplomat stationed in China.

6

The Form I-140 was approved on or about August 27, 2001, and allowed J. Idiagbonya to apply for adjustment of status.

l. On or about February 5, 2002, J. Idiagbonya filed an "Application to Register Permanent Residence or Adjust Status" (Form I-485).

m. On or about February 5, 2002, IDIAGBONYA contemporaneously filed a Form I-485 with the INS wherein he claimed eligibility to adjust status as a derivative spouse. The Form I-485 revealed the following:

1. In response to Part 1, "Date of Last Arrival," IDIAGBONYA answered "01-29-88."

2. In response to Part 3, Section A, "Have you ever applied for permanent resident status in the U.S.," IDIAGBONYA answered, "No."

3. In response to Part 3, Question 1.a., "Have you ever, in or outside the United States, knowingly committed any crime of moral turpitude…for which you have not been arrested," IDIAGBONYA answered, "No."[2]

4. In response to Part 3, question 10, "…have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or

---

[2] IDIAGBONYA's false statements under oath in the aforementioned application for permanent residence is a crime of moral turpitude.

7

procured, a visa, other documentation, entry into the U.S., or any other immigration benefit," IDIAGBONYA answered, "No."

5.    In response to "All Other Names Used" on a "Biographic Information" sheet (Form G-325A) that accompanied the Form I-485, IDIAGBONYA answered, "No."

n.    On or about November 12, 2003, the INS, known then as United States Citizenship and Immigration Services (USCIS), denied the Forms I-485 filed by J. Idiagbonya and IDIAGBONYA.

o.    On or about July 26, 2004, J. Idiagbonya filed an "Application to Register Permanent Residence or Adjust Status" (Form I-485) with USCIS.

p.    On or about July 26, 2004, IDIAGBONYA contemporaneously filed a Form I-485 with the INS wherein he claimed eligibility to adjust status as a derivative spouse. The Form I-485 revealed the following:

1.    In response to Part 1, "Date of Last Arrival," IDIAGBONYA answered "01-29-88."

2.    In response to Part 3, question 1.a, "Have you ever, in or outside the United States, knowingly committed any crime of moral turpitude...for which you have not been arrested," IDIAGBONYA answered, "No."

3.    In response to Part 3, question 10, "...have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or

8

procured, a visa, other documentation, entry into the U.S., or any other immigration benefit," IDIAGBONYA answered, "No."

4. In response to "All Other Names Used" on a Form G-325A that accompanied the Form I-485, IDIAGBONYA provided no answer.

q. On or about December 19, 2005, IDIAGBONYA was interviewed by a USCIS officer in Boston, Massachusetts to determine his eligibility to adjust status. IDIAGBONYA affirmed that the answers on his Form I-485 were correct.

r. On or about April 7, 2006, USCIS approved the Forms I-485 filed by IDIAGBONYA and J. Idiagbonya and both became lawful permanent residents (LPR) of the United States.

s. On or about January 20, 2015, IDIAGBONYA filed an "Application for Naturalization" (Form N-400) with USCIS. The Form N-400 was prepared and filed by IDAGBONYA'S immigration attorney in Durham, North Carolina. IDAGBONYA signed the Form N-400 under penalty of perjury and affirmed that the responses contained on the Form N-400 were true and correct. The Form N-400 revealed the following:

1. In response to Part 2, question 3, "Other Name(s) You Have Used Since Birth," IDIAGBONYA answered, "None."

9

2.  In response to Part 4, question 1, "Where have you lived during the last 5 years," IDIAGBONYA answered "4705 Carlton Crossing Drive, Durham, North Carolina 27713.

3.  In response to Part 10, question 22, "Have you ever committed, assisted in committing, or attempted to commit, a crime or offense for which you were not arrested," IDIAGBONYA marked "No."

4.  In response to Part 10, question 30.E., "Have you ever: married someone in order to obtain an immigration benefit," IDIAGBONYA marked "No."

5.  In response to Part 10, question 31, "Have you ever given any U.S. Government official(s) any information or documentation that was false, fraudulent, or misleading," IDIAGBONYA marked, "No."

6.  In response to Part 10, question 32, "Have you EVER lied to any U.S. government official to gain entry or admission into the United States or to gain immigration benefits while in the United States," IDIAGBONYA marked "No."

7.  In response to Part 10, question 34, "Have you ever been ordered removed, excluded, or deported from the United States," IDIAGBONYA marked, "No."

10

8. In response to Part 10, question 35, "Have you ever been placed in removal, exclusion, rescission, or deportation proceedings," IDIAGBONYA marked "No."

9. In response to Part 10, question 36, "Are removal, exclusion, rescission, or deportation proceedings (including administratively closed proceedings) currently pending against you," IDIAGBONYA marked, "No."

t. As of the writing of this Affidavit, the Form N-400 remains pending with USCIS.

## IMMIGRATION HISTORY OF IKHILE

10. In the course of investigating this matter, I have reviewed the official A-File of an individual claiming to be John Ikhile, born in Agbazillo, Nigeria on a certain date in 1957. The A-file, numbered A070 907 931, which is now consolidated with A-file 027 225 658, reflects the following information:

a. On or about July 19, 1993, IKHILE submitted a "Request for Asylum in The United States" (Form I-589) to the INS. In support of the Form I-589, IKHILE included a set of fingerprints, photographs, and other documentation. The Form I-589 revealed the following:

1. In response to Part A, question 2, "Other names used," IKHILE answered, "None."

11

2. In response to Part A, question 12, "Arrival in the U.S.," IKHILE answered "06-25-92" and "Texas." Additional information provided in the Form I-589 revealed that IKHILE claimed to have entered the United States without inspection.

3. In response to Part B, question 24, "Have you traveled to the United States before," IKHILE answered, "No."

4. In response to Part B, question 25, "List all current travel or identity documents in your possession such as national passport, refugee convention travel document, safe conduct, or national identity card," IKHILE answered, "None."

5. In response to Part B, question 26, "Date of departure from your country of nationality," IKHILE wrote, "05-23-92."

6. IKHILE provided a handwritten statement that alleged the basis of his asylum claim was that he had been the subject of religious persecution at the hands of Muslim fundamentalists in 1992 (note that this is a period in which the individual claiming to be IDIAGBONYA was already residing in the United States).

b. On or about July 19, 1993, IKHILE contemporaneously submitted an "Application for Employment Authorization" (Form I-765) to the INS. The Form I-765 revealed the following:

12

1. In response to question 2, "Other names used," IKHILE answered, "None."

2. In response to question 12, "Date of Last Entry into the U.S.," IKHILE answered, "06-25-92."

3. In response to question 13, "Place of Last Entry into the U.S.," IKHILE answered, "Texas."

4. In response to question 14, "Manner of Last Entry (Visitor, Student, etc.)," IKHILE answered, "Entered without inspection."

c. On or about August 4, 1993, the INS approved the Form I-765 and IKHILE received authorization to work in the United States through August 4, 1994. IKHILE later received an Employment Authorization Document (EAD).

d. Between August 15, 1994 and August 14, 1996, IKHILE submitted three (3) additional Forms I-765 to the INS. They physical copies of the Forms I-765 have been destroyed in accordance with INS/USCIS record retention requirements; however, electronic records maintained by ICE revealed that IKHILE received three (3) additional EADs and last held employment authorization on August 3, 1997.

e. On or about December 4, 1996, IKHILE was interviewed at the Asylum Office in Rosedale, New York (hereinafter referred to as the "Asylum

Office") to determine his eligibility for asylum. IKHILE affirmed that the answers on his Form I-589 were correct.

f.      On or about December 20, 1996, the Asylum Office determined they could not grant IKHILE asylum and referred the Form I-589 to an Immigration Judge.

g.      On or about December 23, 1996, the Asylum Office served IKHILE an "Order to Show Cause and Notice of Hearing" (Form I-221) and ordered IKHILE to appear before an Immigration Judge in New York, New York on May 14, 1997. The Form I-221 alleged that IKHILE had entered the United States without inspection, a violation of Section 241(a)(1)(B) of the Immigration and Nationality Act (INA).

h.      Between May 14, 1997, and June 14, 2000, several immigration hearings were held in New York, New York. IKHILE failed to attend his hearing on June 14, 2000, and an Immigration Judge ordered IKHILE deported to Nigeria, in absentia. IKHILE became an immigration fugitive.

## IDENTIFICATION THAT IDIAGBONYA AND IKHILE ARE THE SAME PERSON

11.    On or about July 1, 2013, the fingerprints contained in IKHILE'S A-File were scanned into IDENT as part of the TGIS/Operation Janus initiative. The fingerprints revealed that IDIAGBONYA and IKHILE were the same individual.

14

12.     On or about April 15, 2015, a lookout was entered into DHS databases for IDIAGBONYA. The lookout referenced that IDIAGBONYA and IKHILE were the same individual.

13.     Photographs obtained from the A-Files belonging to IDIAGBONYA and IKHILE and electronic records maintained by ICE are both shown in Figure 1 below:



*Figure 1: A-File Photographs*

## ENCOUNTERS IN TORONTO, CANADA AND
## RALEIGH, NORTH CAROLINA

14.	On or about May 2, 2015, CBP officers with Toronto, Canada Preclearance Operations (CBP-TPCO) were conducting inspections of passengers travelling to the United States when IDIAGBONYA was identified as the subject of a TGIS lookout. The following actions were taken:

    a.	An interview was conducted by CBP-TPCO officers. During the interview IDAGBONYA stated the following:

        1.	IDIAGBONYA stated that he had never used any other names.

        2.	IDIAGBONYA stated that he had not applied for asylum in the United States.

        3.	IDIAGBONYA stated that he had no knowledge of being ordered deported to Nigeria.

    b.	After the interview, IDIAGBONYA boarded a flight to Raleigh/Durham International Airport (RDU).

15.	On or about May 2, 2015, CBP-TPCO notified CBP officers at RDU (CBP-RDU) of IDIAGBONYA'S arrival. CBP-RDU took the following actions:

    a.	CBP-RDU met IDIAGBONYA upon his arrival and processed IDAGBONYA for deferred inspection. IDIAGBONYA was ordered to report for his deferred inspection at RDU on August 13, 2015.

16

b.     On or about August 13, 2015, IDIAGBONYA and his immigration attorney arrived at RDU for his deferred inspection. As part of the process, CBP-RDU officers interviewed IDIAGBONYA. During the interview, IDIAGBONYA admitted the following:

1.     IDIAGBONYA stated that he had previously used the name "John Ikhile."

2.     IDIAGBONYA stated that he had previously been married and that the marriage was not legitimate. IDIAGBONYA stated that his previous wife had filed an application that she later withdrew, and that he had received a voluntary departure after being placed in deportation proceedings.

3.     IDIAGBONYA stated that after his voluntary departure, he obtained a visa in Canada and reentered the United States in or about 1988.

4.     IDIAGBONYA stated that he, while using the name "John Ikhile," filed a Form I-589 between 1991 and 1993. Further, IDIAGBONYA stated that he was in the United States from the time he was admitted into the United States in 1988 until the time of his Form I-589 filing.

5.     IDIAGBONYA stated that he received the Form I-221 and was aware of deportation proceedings. IDIAGBONYA, stated, however,

17

that he was unaware of a deportation order because he failed to follow-up with his attorney.

c.  At conclusion of the interview, CBP-RDU ordered IDIAGBONYA to appear for an additional deferred inspection on September 17, 2015.

d.  On or about September 17, 2015, IDIAGBONYA appeared for his deferred inspection. CBP-RDU served IDIAGBONYA a "Notice to Appear" (Form I-862); however, the Form I-862 was never served upon the immigration court.

## FINGERPRINT ANALYSIS BY CBP

16.  On or about July 22, 2015, CBP-RDU submitted a request to the City-County Bureau of Identification (CCBI) in Wake County, North Carolina wherein they requested that the CCBI conduct a comparison of one (1) fingerprint card stored in IKHILE'S A-file (from his Form I-589 documentation) and two (2) index fingerprints from IDIAGBONYA'S A-file (from biometrics obtained during adjudication of his Forms I-485).

17.  On or about July 23, 2015, the CCBI responded and noted that the fingerprints were from the same source and were therefore made by the same individual.

## ADDITIONAL FINDINGS

18.  On or about September 17, 2017, IDIAGBONYA filed a "Change of Address Card" (Form AR-11) with USCIS. The Form AR-11 listed IDIAGBONYA'S

18

prior address as 4705 Carlton Crossing Drive, Durham, North Carolina 27713 and new address as the SUBJECT PREMISES.

19. On or about July 16, 2020, I conducted searches of the North Carolina Division of Motor Vehicles (NCDMV) database. The database revealed that IDIAGBONYA had previously been issued North Carolina driver's license (NCDL) ending in 9451, and that on or about September 20, 2017, IDIAGBONYA changed his address of record to the SUBJECT PREMISES.

20. On or about July 16, 2020, I conducted additional searches of the NCDMV database. The database revealed four (4) vehicles with current registration that were registered to IDIAGBONYA, his spouse, or children at the SUBJECT PREMISES. The vehicles were a 2016 Nissan Pathfinder, a 2008 Acura TL, a 2001 Mitsubishi Montero Sport, and a 2016 Mazda CX-5.

21. On or about July 16, 2020, I conducted surveillance at the SUBJECT PREMISES. I observed the aforementioned Acura TL, Mitsubishi Montero Sport, and Mazda CX-5 parked in the driveway of the SUBJECT PREMISES.

22. On or about July 16, 2020, I conducted a search of the Durham County, North Carolina tax and real estate database. The database revealed that IDIAGBONYA and his wife purchased the SUBJECT PREMISES or about July 24, 2017.

23. On or about July 16, 2020, I conducted law enforcement queries via a consolidated public information database using IDIAGBONYA'S name and Social

19

Security number, XXX-XX-2901. The database revealed utility listings and credit bureau records linking IDIAGBONYA to the SUBJECT PREMISES.

## BENEFIT FRAUD CHARACTERISTICS

24.     Based on my knowledge, training, and experience, and from discussions with other law enforcement officers involved in benefit fraud investigations, I know that aliens, due to requirements set as part of past legislation changes relative to immigration policy, retain documents and other records relative to their entry into the United States, length of time in the United States, immigration filings, criminal histories, and familial history. I know that aliens retain identity documents, including both legitimate documents and fraudulent/counterfeit documents in aliases or variations of their name and date of birth, and that they store these identification documents, along with the other records above, for significant periods of time, often their entire lifetime. I know that aliens retain these records and identification documents if they intend to file or have pending applications for immigration benefits. This is because these records and identification documents, or copies thereof, are often required to be filed along with the alien's applications. I know that these records and identification documents are typically stored at the alien's residence so that they are readily available to them if questions arise regarding their immigration status or history, or in the event the documents are needed for interviews or requests for additional evidence related to their applications.

20

25. Additionally, I know from my experience that once an alien obtains "legal" immigration status, or United States citizenship, even under a fictitious or assumed name or identity, that they are likely to file petitions and applications to facilitate the bringing of other family members into the United States from their home country. In order to do this, they are required to show evidence (through records and identification documents) of their familial relationship between the petitioner and beneficiary, thus reverting to their other identity, whether that be the real one or the fictitious one. Aliens retain their records and identification documents due to this requirement.

26. Based on the aforementioned information, and based on my knowledge, training, and experience, I expect to find evidence of the SPECIFIED FEDERAL OFFENSES at the SUBJECT PREMISES.

[remainder of this page intentionally left blank]

## CONCLUSION

27.     Based on the above information, there is probable cause to believe that the SPECIFIED FEDERAL OFFENSES have been violated and that the items listed in Attachment B are to be located at the SUBJECT PREMISES.

28.     Based on the above information, I respectfully request that this Court issue a warrant to search the SUBJECT PREMISES, which is more particularly described in Attachment A, and to authorize the seizure of the items described in Attachment B.

Respectfully submitted,

/S/ Christopher E. Brant
Special Agent
Homeland Security Investigations

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this **23** day of **July**, 2020, at **3:33** a.m./p.m.

The Hon. Joi Elizabeth Peake
United States Magistrate Judge

22

<u>**ATTACHMENT A**</u>

**PREMISES TO BE SEARCHED**

114 Fox Run Court, Durham, North Carolina 27705

The SUBJECT PREMISES is the site of a two (2) story residence located within the Middle District of North Carolina in Durham County. The SUBJECT PREMISE is part of the Stoneybrook Cottages subdivision and is located between the two (2) intersections of Fox Run Court and Brook Chase Lane. The exterior of the residential structure on the SUBJECT PREMISES is constructed of yellow wood and multi-colored stone. A white garage door is located on the right side and the front door, which has a large window, is located near the middle of the SUBJECT PREMISES. A wooden column to the left of the front door is marked "114".



1

## ATTACHMENT B

## PARTICULAR ITEMS TO BE SEARCHED FOR AND SEIZED

This warrant authorizes (i) the search of the SUBJECT PREMISES as described in **Attachment A** for only the following and (ii) authorizes the seizure of the items listed below only to the extent they constitute the following:

1. Evidence constituting, designed for use, intended for use, or used in committing violations of, or showing violations of:

> Title 18, U.S.C., § 1425 - Procurement of Citizenship or Naturalization Unlawfully; or
>
> Title 18, U.S.C., § 1546 - Fraud and Misuse of Visas, Permits, and Other Documents; or
>
> Title 18, U.S.C., § 1028(a) - Fraud in Connection with Identification Documents;

In the form of:

   a. Identity documents for John Monday Ujiagbe Idiagbonya ("IDIAGBONYA") or John Ikhile ("IKHILE");

   b. Other records, whether legitimate, fraudulent, or counterfeit, showing identity information of IDIAGBONYA or IKHILE, either in a true and

1

correct name, or in variations of those names and dates of birth, or in the name of aliases or stolen identities used by IDIAGBONYA or IKHILE;

c. Birth certificates, consular identification cards, foreign voter registration cards, passports, social security cards, passports, driver's licenses, lawful permanent resident cards, or employment authorization documents, or applications or duplicate issuances of such documents, in the name of IDIAGBONYA or IKHILE;

d. Immigration documents, including applications and petitions, for IDIAGBONYA or IKHILE, including naturalization applications, applications to adjust status, employment authorization applications, petitions for name change, affidavits of support, LPR cards, and employment authorization cards;

e. Documents and records showing any previous encounters with immigration officials, including notices of hearings, orders of removal, or warning regarding reentry;

f. Documents, stamps, and records reflecting IDIAGBONYA'S or IKHILE'S entry into and exit from all countries, including the United States;

g. Documents, records and/or other evidence that are in a foreign language and require translation but appear to show immigration or identity information.

2